NATHAN BELCHER ET AL. *v.* GEORGE C. CONWAY, ATTORNEY GENERAL OF THE STATE OF CONNECTICUT, ET AL.

COTTER, C. J., LOISELLE, BOGDANSKI, LONGO and PETERS, Js.

Argued June 14—decision released September 25, 1979

*Kevin E. Booth,* with whom were *Leo J. McNamara, Daniel D. Schwartz* and, on the brief, *Francis T. Londregan,* for the appellants (plaintiffs Gaspare J. Cavasino et al.).

*Bernard F. McGovern, Jr.,* assistant attorney general, with whom, on the brief, was *Carl R. Ajello,* attorney general, for the appellee (named defendant).

*L. P. Gray III,* with whom, on the brief, was *Thomas B. Wilson,* for the appellees (plaintiffs Ralph E. Wadleigh et al.).

*James C. McGuire,* with whom was *Judy A. Rabkin,* for the appellee (defendant Williams Memorial Institute).

COTTER, C. J. Two of the seven trustees of the Bulkeley Trust, referred to by the parties as the minority trustees, appeal from a supplementary judgment of the Superior Court applying the doctrine of approximation, or cy pres, which approved, with modifications, a plan of merger between the Bulkeley School and the Williams Memorial Institute submitted by the majority members of the board of trustees of the Bulkeley School.

The trust in question was created under the will of Leonard H. Bulkeley, who died in 1849. Under the will, all of his residuary estate was left to five named individuals, in trust, to be invested and reinvested by them until the income and gains thereon reached the sum of $50,000. In his will Bulkeley

specifically directed the following: "I desire the said trustees at such time as they shall deem expedient to apply to the Legislature of the State of Connecticut for the passage of an act making said trustees a corporate body, and embodying in the act of incorporation the substance and matter contained herein in relation to the trust premises and Bulkeley School, and also with the power to the said trustees so incorporated and to their successors to receive, hold, and manage, any gift, grant, legacy, devise, bequest and trust which may be hereafter made to them for the use, improvement or benefit of said school." The will also provided that the trustees purchase land in New London and erect a substantial building thereon suitable for the purposes of a school which was "to be always used for" those purposes at the trust fund's expense. The will also provided that the land and buildings were not to cost more than $7000 and that the trustees were to expend the net income of the trust to support and maintain "forever in the said city of New London a school to be called Bulkeley School to be always free to all male youth between the age of 12 and 21 years, who shall be resident of and have their homes in the city of New London and who shall previous to their admission into said school pass an examination in a manner satisfactory to the said trustees or their successors in such branches of learning as the said trustees or their successors may prescribe. My will is that said school shall be managed under the supervision and direction of the said trustees and their successors, and that the youth therein be instructed in morals and in such branches of learning and science as the said trustees and their successors shall from time to time prescribe and appoint. My wish is that no priest or clergyman be ever employed as

a teacher in said school." Upon the death, incapacity or resignation of a trustee the surviving trustees were to appoint another to fill the vacancy.

In 1850, the trustees of Bulkeley School were, as directed in the will, incorporated as the Trustees of Bulkeley School by special act of the General Assembly to carry out the provisions of the trust which included all the purposes and powers granted to them under the will. Later, on May 31, 1870, the General Assembly amended the charter of the Trustees of Bulkeley School so that they were not required to erect a building for the purposes mentioned in the charter until the value of the estate in their hands amounted to $80,000 and empowering them to expend $30,000 for land and buildings. The trustees and their duly appointed successors acquired a tract of land by gift from the city of New London and erected a suitable school building thereon to which additions were made from time to time and to which a tract of land and a gymnasium were later added by another gift from the city.

The Bulkeley School commenced operations in 1873, under the control and supervision of the board of trustees. At that time, there was no secondary school in the city of New London. Consequently, boys from the city were enrolled in the Bulkeley School, and the city reimbursed the school for the cost of educating these students.

On June 22, 1905, the charter was again amended by the General Assembly increasing the number of trustees to seven and providing that the president of the New London board of education should be, ex officio, a trustee and that at least one of these trustees should be a graduate of the Bulkeley School on nomination by the alumni of that school. By

virtue of this amendment to the charter, the interests of the city and of the students were represented on the board of trustees.

The school continued in operation until 1951, when the city of New London decided to build and maintain its own high school. Thereupon, in May, 1951, the trustees brought an action seeking authorization to sell the real property known as the Bulkeley School to the city of New London for $200,000 and for advice as to the future administration of the trust. In that lawsuit the trustees alleged, inter alia, that because of necessary expenditures for additions to the Bulkeley School buildings, they did not have funds in excess of $15,000, and, except for the income therefrom, a few donations, and nonresident tuition, all the expense of maintenance and operation of the Bulkeley School, including repairs to buildings, salaries of teachers, supplies and other such expenses, had been paid by the city of New London and had averaged in recent years in excess of $90,000 a year. They further alleged that without financial aid from the city of New London it would be impracticable and in part impossible for the trustees to carry out the provisions of the trust provided for in the Bulkeley will, and the purposes of the corporation known as the Trustees of Bulkeley School. On May 29, 1951, the court rendered judgment authorizing the trustees under the Bulkeley will and the Trustees of Bulkeley School to sell the school premises and the tangible personal property known as Bulkeley School, including Mercer Field, to the city of New London for $200,000. They were also authorized and directed to hold the funds already in their possession and the proceeds of the sale, in trust, and to invest and reinvest the funds as in their discretion they deemed proper and prudent, and to accumulate

and add to the principal all income and increase from the trust funds for a period of twenty-five years from the date of the judgment, at which time, if it then appeared practicable, they were to purchase or erect a suitable building and operate and maintain the same as a school for boys under the limitations and in the manner and for the purposes set out in the will. If at that time it appeared impracticable to the trustees to carry out the provisions of the will, the trustees were to apply to the Superior Court for advice and direction.

When the suit was originally brought in 1951, there were seven plaintiffs including the president of the New London board of education, and a graduate of the Bulkeley School nominated by the alumni of said school. It was alleged that those seven original plaintiffs were the successors of the original trustees and that they were, at that time, the trustees of the Bulkeley School and the members of the corporation known as the Trustees of Bulkeley School. The 1951 judgment also included those seven plaintiffs as the trustees under the will of Leonard H. Bulkeley and as the Trustees of Bulkeley School.

In 1976, however, the attorney representing only Troland and four new trustees elected to fill four of six vacancies made a motion, which was granted, to substitute only those four as parties plaintiff, at the same time alleging that six of the former plaintiff trustees were deceased. No motion was made, however, to fill the vacancies reserved for the president of the New London board of education and for a graduate of the Bulkeley School, the minority trustees, as provided by the 1905 amendment to the charter of the Trustees of Bulkeley School. These five trustees (hereinafter the majority trustees),

through their attorney, alleged that "prevailing economic conditions, the costs of construction, and the costs of staffing and maintaining a school, tuition free," made it impracticable to carry out the provisions of the will and therefore applied again to the court for advice and direction.

Pursuant to a motion of the majority trustees, the heirs and representatives of the late Leonard H. Bulkeley were subsequently cited as codefendants in the action and, by agreement, the motion of the Williams Memorial Institute for permission to intervene as a party defendant was granted and it was represented at trial by counsel of its choice. The minority trustees, the appellants in this appeal, requested and were granted permission by the court to be made parties plaintiff in this action, but the court denied their motions to participate in the trial with the assistance of counsel of their choice.

Following a trial to the court, the plan of merger submitted by the majority trustees was, with modifications, approved as an appropriate method of preserving and effectuating the general purpose of the charitable trust under the doctrine of cy pres. From that supplementary judgment, the minority trustees have appealed to this court raising the following two claims: (1) the trial court erred in refusing their request for the assistance of counsel of their own choice; and (2) the plan approved by the trial court does not most nearly approximate the intention expressed in the will of the late Leonard H. Bulkeley.

I

Both the majority trustees and the Williams Memorial Institute counter the minority trustees' claim regarding the assistance of counsel by arguing

that all seven trustees comprise a single unit known as the Trustees of Bulkeley School and that they speak with a collective voice in accordance with the principle of majority rule. It is further contended that all of the trustees, including those in the minority, are now represented by counsel selected by the majority and, therefore, have no right to separate counsel of their choice. Under the circumstances of this case, we cannot agree.[1]

It is clear that once the authority of the court is invoked, the ultimate responsibility for the application of the doctrine of cy pres or approximation to a charitable trust lies with the court and not with the trustees or the attorney general. *Lockwood* v. *Killian*, 172 Conn. 496, 508, 375 A.2d 998; see Bogert, Trusts and Trustees (2d Ed.) § 435. Consequently, the plan finally adopted by the court need not necessarily be one proposed or consented to by any of the parties. See Bogert, op. cit. § 441; Restatement (Second), Trusts § 399, comments (d) and (f). The court, in applying the doctrine, is required to consider not only the language used in creating the trust but, if necessary, extrinsic facts as well. *Lockwood* v. *Killian*, supra, 507–508; *Ministers Benefit Board* v. *Meriden Trust Co.*, 139 Conn. 435, 444, 94 A.2d 917; Restatement (Second), Trusts § 399, comment (d). Through the presentation of evidence and the adversarial nature of the proceedings, the court is best able to reach a determination as to the proper scheme necessary to most closely effectuate the purpose of the trust. *Lockwood* v. *Killian*, supra, 509.

---

[1] We also reject the claim that the minority trustees have no right to appeal from the judgment of the trial court. See *O'Leary v. McGuinness*, 140 Conn. 80, 88, 98 A.2d 660; *Waterbury Trust Co.* v. *Porter*, 130 Conn. 494, 499–500, 35 A.2d 837.

In these proceedings, the court may permit the intervention of those not named as parties to the action who are found to have a proper interest in the outcome of the litigation. Bogert, op. cit. § 441; 4 Scott, Trusts (3d Ed.) § 391; see *New York East Annual Conference* v. *Seymour,* 151 Conn. 517, 521–22, 199 A.2d 701 (pursuant to General Statutes § 3-125, the attorney general is a necessary party to all proceedings involving charitable gifts). In the present case, the minority trustees, by virtue of the granting of their motions to be made parties plaintiff, were properly deemed by the trial court to have a recognizable interest in this action. Nonetheless, the court refused to permit counsel of their choice to represent them at trial.

Despite the paucity of reported decisions on the precise issue raised in the present case, we have no doubt as to the error of the trial court's ruling. Although it is a settled rule of trust law that where there are multiple trustees, the powers conferred upon them can only be exercised by a majority; Restatement (Second), Trusts §§ 194, 383; 3 Scott, Trusts (3d Ed.) § 194; Bogert, Trusts and Trustees (2d Ed.) § 391; there is another principle of trust law which permits one trustee to bring an action against his cotrustees to compel the latter to perform their duties or to enjoin them from committing a breach of trust or to compel them to redress a breach of trust. *Holt* v. *College of Osteopathic Physicians & Surgeons,* 61 Cal. 2d 750, 394 P.2d 932; *Richards* v. *Midkiff,* 48 Haw. 32, 396 P.2d 49; Restatement (Second), Trusts § 391; Bogert, op. cit. § 412; 4 Scott, op. cit. § 391. That principle, which has as its basis the fiduciary duty owed to the beneficiaries by each trustee, is, by analogy, relevant to the question presented here.

Moreover, the application of majority rule to the actual administration of the trust loses much of its vitality once the equitable power of the court is invoked in a cy pres proceeding. Such a situation is similar to a case where trustees seek instructions from a court as to the proper administration of the trust, where all parties acting primarily for the benefit of the estate may properly employ counsel of their choice. *Detroit Trust Co.* v. *Blakely,* 359 Mich. 621, 103 N.W.2d 413; see *In Re Estate of Kelley,* 126 N.J. Super. 376, 314 A.2d 614; see, generally, annot., "Right of coexecutor or cotrustee to retain independent legal counsel," 66 A.L.R.2d 1169. In fact, some courts have allowed charges against the trust for the fees of counsel employed by the cotrustees. See *Detroit Trust Co.* v. *Blakely,* supra; annot., 66 A.L.R.2d 1169.

In sum, in the litigation involved in the present case, it is clear that the position of the minority trustees was antagonistic to that of the majority, and the minority trustees had an interest in the use of the corpus of the trust which is evidenced by the legislative action in 1905 amending the charter. That interest in the litigation was the protection of the beneficiaries of the trust consistent with the dominant, charitable intent of the settlor. Mr. Cibes, the president of the New London board of education, and Mr. Cavasino, a representative of the alumni of the Bulkeley School, opposed the plan submitted by the majority trustees on the ground, inter alia, that the settlor's intent to provide free education to New London males was not most nearly approximated. The trial court, in an adversarial proceeding, was bound to make an independent determination of the most appropriate plan to best approximate the intent of the late Leonard H.

Bulkeley. See *Lockwood* v. *Killian,* 172 Conn. 496, 509, 375 A.2d 998. In order to obtain the necessary evidence from all interested parties, the court quite properly allowed the participation of the minority trustees. Without legal representation, however, their admission as parties was meaningless. The denial of their request to have counsel of their choice to aid in advocating their particular position, therefore, was both unjustified and erroneous under the facts presented here.[2]

In the alternative, both the majority trustees and the Williams Memorial Institute argue that the error, if any, in the refusal of counsel to the minority trustees was harmless. In this regard, they point out that the minority trustees were permitted to present their plan to the court, to explain to the court their objections to the plan proposed by the majority, and to present information and questions to the assistant attorney general who introduced and cross-examined witnesses on their behalf. The attorney general, however, has the statutory responsibility to "represent the public interest in the protection of any gifts, legacies or devises intended for public or charitable purposes. . . ." General Statutes § 3-125. Moreover, in his brief to this court, the attorney general argues in support of the plan submitted by the majority trustees and adopted, with modifications, by the court. The claim that the attorney general was an adequate representative of the position advanced by the minority trustees is, therefore, without merit. See *Murphey* v. *Dalton,* 314 S.W.2d 726 (Mo.). Although the court was concededly apprised of the plan supported by the minor-

[2] Our conclusion is further supported by the fact that, according to a review of the transcript, counsel for the Williams Memorial Institute actively participated in the proceedings before the trial court.

ity trustees, separate legal counsel actively participating as an advocate on behalf of the minority trustees in this adversary proceeding might have effected a different result. Consequently, a new trial with the participation of counsel chosen by the minority trustees is mandated.

## II

Since a new trial is necessary, we are not required to address the merits of the supplementary judgment of the trial court regarding the application of the doctrine of approximation in this case. With additional counsel actively advancing the position of the minority trustees, the court might be afforded the opportunity to review additional facts and proposals which may well alter the result or the basis for the approved plan. The views we have expressed herein do not reflect any opinion as to the propriety of that plan as approved, as to which we have serious reservations.

There is error in part, the judgment is set aside and a new trial is ordered.

In this opinion the other judges concurred.