[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
Memorandum Filed June 3, 1997
I. Summary of the Facts and Procedural History:
The plaintiffs Louise Grabowski and Mary Mikulak (hereinafter "Grabowski," "Mikulak," or the "plaintiffs") allege that various municipal and private entities have violated the terms of a charitable trust, to the detriment of themselves and other residents in the City of Bristol (hereinafter the "City") Grabowski is and has been an owner of land directly abutting the City's Peck Park. Mikulak and her husband also own land abutting Peck Park. Both plaintiffs are residents, taxpayers and citizens of the City who use the City's public park facilities. The complaint alleges that the Attorney General of the State of Connecticut, who is charged with the responsibility of enforcing charitable trusts pursuant to General Statutes § 3-125, is a necessary party to this action. The court record reveals that the CT Page 6953 Attorney General filed an appearance in the matter but has determined that it "will not further participate" Attorney General's Withdrawal of Brief in Opposition to Motion to Dismiss, p. 1-2.
The plaintiffs allege that the residuary clause of the last will of Constant Y. Peck, dated August 3, 1964 (hereinafter the "Peck Will and Trust"), bequeathed the rest, residue, and remainder of the testator's estate to the Bristol Bank and Trust Company (succeeded by Fleet Bank, N A.) and to the Superintendent of Parks of the City of Bristol for the following purpose: "[t]hat all of the assets be converted to cash . . . and the money thereby available . . . be used for the purchase of a parcel of land to be presented to the City of Bristol for recreational or park use" According to the plaintiffs, the Peck Will and Trust imposed the following restrictions: that the land never be planted with any plant, shrub or tree not native to Connecticut, that no part of the parcel ever be alienated for commercial development, that the land be bordered, if possible, by water,and that the parcel not be contiguous to any other park or areawhich is being used by the City of Bristol for recreational orpark purpose. (Emphasis supplied.) According to the plaintiffs, the bequest specifically sought to prevent the absorption of the proposed park by a larger recreational area. In 1966, the assets of the estate became available for the purchase of a parcel of land to be presented to the City of Bristol.
The plaintiffs allege that despite the express terms of the trust, the trustees did not purchase land that could be presented to the City Rather, they allege that through a series of transactions undertaken by the municipality, land was set aside for the development of a park in accordance with the Peck Will and Trust. According to the complaint, the Bristol City Council accepted a transfer of undeveloped land from the Greene Hill s School through the Board of Education for the purpose of creating a park in accordance with the Peck Will and Trust. The complaint specifically alleges that on April 5, 1977, the City Council "resolved `That the land which is described in Schedule A and made a part [thereof] be set aside in perpetuity for recreational or park use in memory of Burdette Abel Peck and Elizabeth Terry Peck in accordance with the provisions of the Last Will and Testament of Constant Y Peck.'"
Prior to 1992, and continuing to the time the complaint was filed, the Forestville Little League, Inc. (hereinafter the CT Page 6954 "Little League"), constructed and operated three ball fields on a portion of Greene-Hills School property, not the subject of the transfer to the City, that abutted Peck Park along its northerly boundary. According to the plaintiffs, the Bristol Board of Park Commissioners authorized the private Little League organization to create a new baseball field (the "fourth ball field") on the land that had been set aside as Peck Park in 1977. The resulting ball field is alleged to have been constructed within 50 feet of the Mikulak residence.
The complaint alleges that the development of the fourth ball field caused approximately 170 trees to be cut down and caused the removal of playground facilities from within Peck Park. When standing, the trees served as an effective noise and visibility barrier in the community. In the course of constructing the fourth ball field, 48 truckloads of sewage sludge were allegedly deposited and spread under the turf. Gates that stand between the school property and Peck Park have been kept open, permitting constant ingress and egress between the first three and the fourth ball field. The plaintiffs claim that vehicles associated with Little League activities routinely drive through the gates and remain on Peck Park land, transporting as many as 2,000 children, coaches, and spectators who gather on the field for Little League activities. The complaint alleges that the City transferred exclusive use and control over the fourth ball field to the private Little League, enabling the league to restrict or prohibit others from making use of the land that had been a part of Peck Park in contravention of the terms of the Peck Will and Trust.
Accordingly, the plaintiffs claim that the trustees have breached their fiduciary duties (Count One), and urge the court to void the action of the Board of Commissioners on July 15, 1992, granting Peck Park land to the Little League for its exclusive use and control (Count Two). Finally, the plaintiffs claim that the alteration of Peck Park has created a nuisance (Count Three).
The defendant trustee, Fleet Bank, N.A (hereinafter the "defendant" or the "Trustee") claims in its Motion to Dismiss that the plaintiffs lack standing to enforce the trust because that authority is reserved to the Attorney General, thereby depriving the court of subject matter jurisdiction.
II. Motion to Dismiss CT Page 6955
"A motion to dismiss . . . properly attacks the jurisdiction of the court essentially asserting that the plaintiff cannot as a matter of law and fact state a cause of action that should be heard by the court" (Emphasis in original; internal quotation marks omitted.) Gurliacci v. Mayer, 218 Conn. 531, 544,590 A.2d 914 (1991). It tests, "inter alia, whether, on the face of the record, the court is without jurisdiction" Upson v. State,190 Conn. 622, 624, 461 A.2d 991 (1983).
In deciding a motion to dismiss, the court must consider the allegations of the complaint in their most favorable light.Savage v. Aronson, 214 Conn. 256, 263, 571 A.2d 696 (1990). "The motion . . . admits all facts which are well pleaded, invokes the existing record and must be decided upon that alone . . . Where, however . . . the motion is accompanied by supporting affidavits containing undisputed facts, the court may look to their content for determination of the jurisdictional issue and need not conclusively presume the validity of the allegations of the complaint" (Citations omitted; internal quotation marks omitted )Barde v. Board of Trustees, 207 Conn. 59, 62, 539 A.2d 1000
(1988).
A. Standing in general
The defendants claim that the court lacks jurisdiction to hear this matter because the plaintiffs do not have standing to bring it. Standing "is the legal right to set judicial machinery in motion. One cannot rightfully invoke the jurisdiction of the court unless he has, in an individual or representative capacity, some real interest in the cause of action . . . [O]nce the question of lack of [standing] is raised [it] must be disposed of no matter in what form it is presented. . . ." Fink v. Goldenbock,238 Conn. 183, 199, 680 A.2d 1243 (1996) The court is required to address the jurisdictional standing issue before proceeding further with the case. Id.
"Standing focuses on whether a party is the proper party to request adjudication of the issues, rather than on the substantive rights of the aggrieved parties . . . It is a basic principle of law that a plaintiff must have standing for the court to have jurisdiction . . . Standing is not a technical rule intended to keep aggrieved parties out of court; nor is it a test of substantive rights. Rather, it is a practical concept designed to ensure that courts and parties are not vexed by suits brought CT Page 6956 to vindicate nonjusticiable interests and that judicial decisions which may affect the rights of others are forged in hot controversy, with each view fairly and vigorously represented. . . . These two objectives are ordinarily held to have been met when a complainant makes a colorable claim of direct injury he has suffered or is likely to suffer, in an individual or representative capacity. Such a personal stake in the outcome of the controversy provides the requisite assurance of concrete adverseness and diligent advocacy. . . . Thus, standing does not hinge on whether the plaintiff will ultimately be entitled to obtain relief on the merits of an action, but on whether he is entitled to seek the relief." (Citations omitted.)Herzog Foundation v. University of Bridgeport, 41 Conn. App. 790,793, 677 A.2d 1378, cert. granted, 239 Conn. 907 (1996) (argued but not decided at the time of this writing) See also Steeneck v.University of Bridgeport, 235 Conn. 572, 590,668 A.2d 688 (1995).
B. Standing to enforce provisions of a charitable trust
As a general rule, the Attorney General is given exclusive authority to enforce charitable trusts. As the Comment to the Restatement 2d of Trusts § 391 observes, "[s]ince the community is interested in the enforcement of charitable trusts, a suit to enforce a charitable trust can be maintained by the Attorney General of the State in which the charitable trust is to be administered" Connecticut adheres to this rule Specifically, General Statutes § 3-125 provides that the Attorney General shall "represent the public interest in the protection of any gifts, legacies or devises intended for public or charitable purposes." The rationale for this rule is well established. In the absence of a limitation on standing to enforce charitable trusts, such trusts could be subject to lawsuits by any disgruntled member of the public. Herzog Foundation v. Universityof Bridgeport, supra, 41 Conn. App. 793.
The rule conferring exclusive jurisdiction on the Attorney General to enforce charitable trusts is not absolute, however Commentators and Connecticut case law recognize a "special interest" exception to the Attorney General's enforcement powers. "Beneficiaries with a sufficient special interest in the enforcement of a charitable trust can initiate a suit as to that trust" Steeneck v. University of Bridgeport, supra, 235 Conn. 588
(citing Jones v. Grant, 344 So.2d 1210, 1212 (Ala. 1977)). In order to maintain such an action, the plaintiff must plead CT Page 6957 sufficient facts to demonstrate that he is "entitled to receive a benefit under the trust that is not merely the benefit to which members of the public in general are entitled." 4 Scott, The Law of Trusts, § 391.
A series of Connecticut cases have approved, either explicitly, or by implication, the "special interest" exception to the general rule prohibiting enforcement actions by plaintiffs other than the Attorney General. Our Supreme Court, citing cases from other jurisdictions that permitted standing under the "special interest" theory, recently assumed, without deciding, that the special interest exception may authorize persons other than the Attorney General to file suit to enforce the terms of a charitable trust. See Steeneck v. University of Bridgeport,supra, 235 Conn. 588[1]. Likewise, the Appellate Court, inHerzog Foundation, Inc. v. University of Bridgeport, supra,41 Conn. App. 790 expressly stated that "[o]thers [beside the attorney general] may . . . have standing to enforce charitable trust provisions, such as trustees, donors of gifts and heirs and executors of wills, which standing includes the right to bring actions to intervene or to intervene in actions brought to enforce the provisions of trusts or wills" In Belcher v. Conway,179 Conn. 198 (1979), the Court permitted intervention by minority co-trustees, as party plaintiffs, for purposes of opposing a modification of the original trust's terms being sought by the majority of co-trustees. It stated that "the court may permit the intervention of those not named as parties to the action who are found to have a proper interest in the outcome of the litigation. . . ." Id. 206. See also Day v. City of Hartford,16 Conn. Sup. 228 (1949) (authorizing suit by "citizens, residents and taxpayers of the City of Hartford" who alleged pecuniary and other interests in two bridges that had been given to Hartford by way of a trust, for the purpose of preventing the bridges' destruction).
The precise issue raised in this case is whether the allegations set forth in the plaintiffs' complaint, which must be accepted as true for the purpose of deciding the motion to dismiss; Savage v.Aronson, supra, 214 Conn. 263; are sufficient to confer standing on the plaintiffs. Resolution of this issue is governed by the "time honored rule that [s]tanding is not a technical rule intended to keep aggrieved parties out of court; nor is it a test of substantive rights. Rather it is a practical concept designed to ensure that courts and parties are not vexed by suits brought to vindicate nonjusticiable interests and that judicial CT Page 6958 decisions which may affect the rights of others are forged in hot controversy, with each viewed fairly and vigorously represented."Steeneck v. University of Bridgeport, supra, 235 Conn. 590
(quoting Board of Pardons v. Freedom of Information Commission,210 Conn. 646, 648-49 (1989)).
In their complaint, the plaintiff owners of property abutting Peck Park, allege interests not shared by the general public in the enforcement of the charitable terms of the Peck Will and Trust. They allege that the playground used by their families has been removed, that the sound and visual barrier established by trees that had been growing on Peck Park was diminished by the removal of approximately 170 trees to make room for the fourth ball field, that the natural character of the park as originally intended by the settlor has been impaired by the construction of a fourth ball field, that the integrity of the Grabowski home's ground water may have been jeopardized by the use of sludge in the construction of the field and that their access to the public park has been circumscribed by the grant of exclusive control over the area constituting the fourth ball field to a private Little League organization. These allegations, which must be accepted as true for purposes of deciding the motion to dismiss;Savage v. Aronson, supra, 214 Conn. 263; are sufficient to confer standing on the plaintiffs.
This conclusion is consistent with the decisions of other jurisdictions conferring standing on members of the public to enforce charitable trust provisions involving the creation, maintenance or preservation of public park property. In the leading case of Kapiolani Park Preservation Society v. City andCounty of Honolulu, 751 P.2d 1022 (1988), the Supreme Court of Hawaii ruled that, regarding park land held by a charitable trust, public-users of the park have standing to challenge the decision of trustees, supported by the Attorney General, to lease park land. The Hawaii court reasoned that "to hold otherwise, the City, with the concurrence of the [A]ttorney [G]eneral, would be free to dispose, by lease or deed, of all, or parts of, he trust comprising Kapiolani Park, as it chose, without the citizens of the City and State having recourse to the courts" Id. 1025. "Such a result," the court explained, "is contrary to all principles of equity and shocking to the conscience of the court." Id. Likewise, in a subsequent action, the Supreme Court of Hawaii determined that a nonprofit corporation had standing to challenge a sale of public land[2] by the State, in its capacity as trustee, when the sale would allegedly have violated the terms CT Page 6959 of a public trust. Pele Defense Fund v. Paty, 837 P.2d 1247
(1992). Recognizing the "court's decisions lowering standing barriers in cases of public interest;" id. 1257; the Hawaii Supreme Court held that "unless members of the public as beneficiaries of the trust, have standing, the State would be free to dispose of the trust res without the citizens of the State having any recourse" Id. 1258 (citing Kapiolani, supra). See, also Matter of Hill, 509 N.W.2d 168 (Minn.App. 1993) holding that when the Attorney General elects not to participate in an enforcement proceeding, a person interested in the trust may appear on behalf of the public at large so as to avoid leaving the interests of beneficiaries of the public trust unprotected.
In this case, Peck Park was created pursuant to a charitable trust. The plaintiffs allege that the terms of the trust have been breached and that the Attorney General, who is ordinarily charged with the duty to protect the public's interest in charitable gifts, has declined to prosecute this action on their behalf. Because "[s]tanding is not a technical rule intended to keep aggrieved parties out of court . . . [but] [r]ather . . . is a practical concept designed to ensure that courts and parties are not vexed by suits brought to vindicate nonjusticiable interests;" Herzog Foundation v. University of Bridgeport,supra, 41 Conn. App. 793; the defendant's motion to dismiss is denied for the reasons previously set forth.
So ordered.
Holzberg, J.